**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

SOUTHERN DISTRICT OF MISSISSIPPI
**F I L E D**

JUL 25 2012

J T NOBLIN CLERK
BY _____ DEPUTY

JOANNE GLENN, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE ESTATE OF
CHRISTOPHER THOMAS GLENN AND
ADMINISTRATRIX OF THE ESTATE OF BRYAN
LEE GLENN; AND DANIEL LEE GLENN                                    **PLAINTIFFS**

**VERSUS**                          CIVIL ACTION NO. 1:12cv227 H50-RHW

IMPERIAL PALACE OF MISSISSIPPI, LLC , A
NEVADA LIMITED LIABILITY COMPANY; IP
HOLDINGS, INC., A NEVADA CORPORATION;
BETTY ENGELSTAD, DIRECTOR/TRUSTEE OF IP
HOLDINGS, INC.; ENGELSTAD FAMILY
FOUNDATION,  BY AND THROUGH ITS
TRUSTEES, BETTY ENGELSTAD, W. OWEN NITZ,
JEFFREY COOPER, AND KRIS MCGARRY; BOYD
GAMING CORPORATION, A NEVADA
CORPORATION; AND JOHN DOE 1-15                                    **DEFENDANTS**

## COMPLAINT

### (JURY TRIAL REQUESTED)

COME NOW, Joanne Glenn, individually and as Administratrix of the Estate of Christopher

Thomas Glenn and Administratrix of the Estate of Bryan Lee Glenn, and Daniel Lee Glenn and file

this Complaint for damages.  In support thereof, they would show the following:

### A.    THE PARTIES

### PLAINTIFFS

1.       Joanne Glenn [hereinafter sometimes "Joanne"] was the mother of Bryan Lee Glenn

[hereinafter sometimes "Bryan"].  She is a resident of the State of Virginia, residing at 2762

Forksville Road, LaCrosse, Virginia  23950.  She brings this action individually, as the surviving

natural mother of Bryan Lee Glenn, and as the Administratrix of the Estate of Bryan Lee Glenn and

the Administratrix of the Estate of Christopher Thomas Glenn.

2.    Christopher Thomas Glenn [hereinafter sometimes "Chris"] was the surviving brother of Bryan Lee Glenn. Chris died on February 25, 2011.

3.    Daniel Lee Glenn was the father of Bryan.  He is a resident of the State of Virginia, residing at 7504 Sturgeon Road, Warfield, Virginia 23889.  He brings this action as the surviving natural father of Bryan.

4.    The plaintiffs are the persons or parties entitled to bring an action for the wrongful death of Bryan Lee Glenn, pursuant to MISS CODE ANN. §11-7-13 (Supp. 2004).

## DEFENDANTS
### Imperial Palace of Mississippi, LLC, a Nevada Limited Liability Company

5.    The defendant, Imperial Palace of Mississippi, LLC is a Nevada Limited Liability Company [IPM-NV].  IPM-NV is the surviving company of a merger on December 22, 2011, between IPM-NV and Imperial Palace of Mississippi, LLC, a Mississippi Limited Liability Company [IPM-MS].  IPM-MS was the owner, operator, licensee and permittee of the Imperial Palace Casino located at 850 Bayview Avenue, Biloxi, Mississippi in August 2009, when the events detailed below occurred.

6.    IPM-NV may be served by service on its register agent for service of process in Nevada, National Registered Agents, Inc. of NV, 1000 East William Street, Suite 204, Carson City, Nevada 89701 and by service on its managers, as trustees under Nevada law.  On information and belief, the members of IPM-NV are the Engelstad Family Foundation and IP Holdings, Inc., a Nevada Corporation, whose principal place of business was in the state of Nevada.

### IP Holdings, Inc., a Nevada Corporation

7.    The defendant, IP Holdings, Inc. [IP Holdings] is a corporation organized under the laws of the State of Nevada, with its principal place of business located at 851 S. Rampart Blvd., Ste

150, Las Vegas, Nevada 89145-4482.  The agent for service of process for IP Holdings is Jeff

Cooper, Bradshaw Smith & Co LLP, 5851 West Charleston, Las Vegas, Nevada 89146.

      8.     Alternatively, if, in fact, IP Holdings was legally dissolved, service of process on IP

Holdings under Nevada law may be made by mailing copies of the process and any associated

records by certified mail, with return receipt requested to the registered agent and each officer and

director of the corporation as named in the list last filed with the Secretary of State before the

dissolution.  The last filed list with the Secretary of State listed  Betty Engelstad, 851 S. Rampart

Blvd., Ste 150, Las Vegas, Nevada 89145-4482, as the sole Director, President, Secretary, and

Treasurer of IP Holdings.

**Betty Engelstad,**
**Trustee of IP Holdings, Inc.**

      9.     Betty Engelstad is also sued as a trustee of IP Holdings.   IP Holdings filed a

Certificate of Dissolution on December 29, 2011.  Pursuant to Nevada Revised Statute 78.590, the

directors of a dissolved corporation become trustees of the dissolved corporation, empowered to

defend claims in the corporate name.  The director of IP Holdings on the date of attempted

dissolution was Betty Engelstad, an adult resident citizen of the State of Nevada, who may be served

with process as required by law at 851 S. Rampart Blvd., Ste 150, Las Vegas, Nevada 89145-4482.

**Engelstad Family Foundation, by and through its Trustees,**
**Betty Engelstad, W. Owen Nitz, Jeffrey Cooper, and Kris McGarry**

      10.    The Engelstad Family Foundation is a foundation registered under the laws of the

State of Nevada with its principal place of business in the State of Nevada.  The Engelstad Family

Foundation, through its Trustees, is sued as the Manager-Member of IPM-MS and IPM-NV and as

the stockholder of IP Holdings, to the extent of any assets distributed to it after the attempted

dissolutions of IP Holdings or IPM-NV, as "alter-ego" of said entities should the "corporate veil" be

pierced or as constructive trustee, if assets held by it are subject to a trust in favor of creditors, such as plaintiffs.

11.    The Engelstad Family Foundation may be served with process by service on its Trustees, who are also named, as follows:

    a.    Betty Engelstad, Vice President/Trustee, by service at 851 S. Rampart Blvd., Ste 150, Las Vegas, Nevada 89145-4482.  Betty Engelstad is an adult resident citizen of the State of Nevada;

    b.    W. Owen Nitz, Secretary/Trustee, by service at 601 South 10th Street, Ste 201 Las Vegas, Nevada 89101.  W. Owen Nitz is an adult resident citizen of the State of Nevada;

    c.    Jeffrey Cooper, Treasurer/Trustee, by service at 5851 West Charleston Blvd., Las Vegas, Nevada 89146.  Jeffrey Cooper is an adult resident citizen of the State of Nevada; and

    d.    Kris McGarry, Vice President/Trustee, by service at 851 S. Rampart Blvd., Ste 150, Las Vegas, Nevada 89145-4482.  Kris McGarry is an adult resident citizen of the State of Nevada.

**Boyd Gaming Corporation, a Nevada corporation**

12.    Boyd Gaming Corporation is a foreign corporation organized under the laws of the state of Nevada, with its principal place of business in the state of Nevada.  Its agent for service of process in Mississippi is Toni Burns, 1477 Casino Strip Blvd, Robinsonville, Mississippi 38664, where she may be served with process in the form and manner required by law.

**John Doe 1-15**

13.     John Doe 1-15 are individuals, employees, companies, foundations, corporations, or other entities, trustees, directors, stockholders or officers of companies, foundations, corporations, or other entities, whose identities and/or liabilities are not known at this time, after diligent search and inquiry, and who engaged in wrongful conduct as alleged; have vicarious or successor liability for such conduct; are licensees of alcoholic beverage permits, including light wine and beers permits; were licensees of casino permits at the IP Casino on August 6, 2009; are successors in interest to any responsible entity or person, including by depletion of or succession of assets of a responsible entity, corporate trust fund, operation of law, fraud, successor liability, continuation of enterprise, or for any other reasons found to be applicable.  Plaintiffs reserve the right to amend these pleadings once these defendants' true identities are discovered.

### B.     JURISDICTION AND VENUE

14.     Jurisdiction of this Court is predicated on 28 U.S.C. Section 1332 in that this civil action involves a controversy between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Venue is proper in the United States District Court for the Southern District of Mississippi, Southern Division.

15.     Once served, this Court will have *in personam* jurisdiction over the defendants.  Each nonresident defendant made a contract with a resident or non-resident of this state to be performed in whole or in part by any party in this state, or committed a tort in whole or in part in this state against a resident or nonresident of this state, or conducted business or performed work or service in this state, such that the defendant's acts are deemed to be "doing business" in Mississippi and subject to the jurisdiction of the courts of this state under MISS. CODE ANN. §13-3-57 (Rev. 2002).

### C.    VACARIOUS AND SUCCESSOR LIABILITY

16.    At all times material hereto, IPM-MS acted by and through its employees, agents, managers, members and trustees.

17.    From and after August 7, 2009, IPM-MS, its managers and members were aware of its liability for the injury and death of Bryan Lee Glenn.

18.    On or about October 4, 2011, BOYD GAMING CORPORATION acquired the assets of IPM-MS.  The transaction was structured to take advantage of the good will of IPM-MS.  As part of that transaction, BOYD acquired and continues to use the trade names, trade marks and logos of IPM-MS; employs hundreds of IPM-MS employees, including supervisory positions; uses the same facilities in the same physical location; sells and markets the same product; retains the same business name; uses IPM-MS assets; continues the use of IPM-MS general business operations; and holds itself out as the continuation of the previous enterprise.  BOYD is liable for the acts of its predecessor, as herein alleged, under successor corporate liability doctrines, including continuity of enterprise.

19.    On or about December 22, 2011, IPM-MS merged with Imperial Palace of Mississippi, LLC, a Nevada Limited Liability Company [IPM-NV].  On December 29, 2011, IPM-NV dissolved.  On information and belief, the assets of IPM-MS and IPM-NV, including the sales proceeds of $278,000,000 for the sale of IP Casino-Biloxi to Boyd Gaming Corporation, in addition to other assets of IPM-MS and IPM-NV, were transferred to its members, leaving IPM-MS and IPM-NV insolvent or unable to pay its creditors, including plaintiffs.  The members, including the Engelstad Family Foundation and IP Holdings, Inc., are liable for all damages allowed by law and to the extent of receipt of disbursed assets as part of the dissolution of IPM-NV.  The members hold the assets of the dissolved entity as trustees for the benefit of the creditors of the dissolved entity.

20.    The members, including the Engelstad Family Foundation and IP Holdings, Inc. are, alternatively, liable for the damages alleged herein through piercing of the corporate veil.

21.    The members, managers and trustees of IPM-NV are liable to the plaintiffs for their damages for failing to properly dissolve the company and by failing to adequately provide for the satisfaction of plaintiffs' claims.  Each holds the assets distributed to them following dissolution in trust subject to the claims of the plaintiffs.

22.    On December 29, 2011, IP Holdings filed a Certificate of Dissolution.  On information and belief, the assets of IP Holdings, including the assets of the dissolved IPM-MS and IPM-NV, were transferred to its shareholders, leaving IP Holdings, Inc. insolvent and unable to pay its liabilities. The directors and trustees are liable for all damages allowed by law. On information and belief, Betty Engelstad is or was the sole trustee, officer, and director of IP Holdings.

23.    The shareholders of IP Holdings, Inc. are liable to the plaintiffs for their damages to the extent of the disbursement to each shareholder following dissolution.  On information and belief, Engelstad Family Foundation was the sole shareholder of IP Holdings.

### D.    FACTUAL BACGROUND

24.    Joanne, Bryan and Chris were residents of and domiciled in Long Beach, Mississippi when Katrina struck the Mississippi Coast on August 29, 2005.  They lost everything, including a roof over their heads and for approximately a year they lived in a FEMA trailer.  Finally, FEMA provided them a place to stay in Virginia, where they had some relatives and friends.  After the FEMA grant ran out, Pam Roger-Seamster, a close friend of the family, provided them a place to stay, in her small home with her and her children.  While Joanne, Bryan and Chris were forced to leave Mississippi, they each considered Mississippi their domicile and intended to return.  These facts arise, in part, out of those efforts.

25.    Bryan Lee Glenn, born July 19, 1979, suffered from a traumatic brain injury received in a four-wheeler accident in 2004. In addition, Bryan was in an automobile accident in 2007, which left him with significant low back injuries.

26.    Bryan was impaired by severe physical and psychological injuries. In 2008 and 2009, he was hospitalized following attempted suicides. His last hospitalization began on or about July 23, 2009, and ended just days before his wrongful death on August 7, 2009. Bryan's diagnoses included schizoaffective disorder, bipolar type, traumatic brain injury, and low back pain secondary to ruptured disc with chronic pain syndrome. Bryan suffered from intermittent visual and auditory hallucinations. He had problems with concentration, memory, forgetfulness, as well as moodiness, emotional instability and increased agitation.

27.    In the three-week-period before his death, Bryan was taking prescribed medications, including Percocet and Morphine for pain, Xanax or Klonopin for anxiety, Haldol for agitation or psychosis, and Ativan for severe anxiety, Cogentin, and Trazodone for sleep. Bryan was prescribed antipsychotic medications to control psychosis and hallucinations. Even though Brian was a large man, some of these medications should never be mixed with alcohol.

28.    Because of his condition and the medications he took, Bryan could not drink alcohol safely. For the same reasons, Bryan's family had difficulty controlling his behavior.

29.    On August 5, 2009, Bryan travelled to Mississippi with his mother Joanne, his brother Chris and their friend Pam Rogers-Seamster. On August 6, 2009, they checked into one room at the IP Casino Resort and Spa located in Biloxi [sometimes "IP Casino" or "Casino"]. The room was paid for by a "comp" provided by the Casino to a friend of Joanne, although Joanne provided her credit card for deposit and to be used for incidental room charges.

30.    The purpose of the trip was for Bryan to meet with his Mississippi attorney to consummate the settlement of a claim, for Chris to attend a court hearing and for the three of them to search for a new place to live on the Mississippi Coast.  Joanne, Bryan and Chris planned to use some of Bryan's settlement money as a deposit on a lease of a new residence in Mississippi.

31.    On the morning of August 6, 2009, Bryan met with his attorney, executed settlement papers and received a check for approximately $15,000.  After receiving the settlement check, Bryan, accompanied by his mother, brother and Pam went to the bank and cashed the settlement check.  The time was approximately 10:30 A.M.

32.    They had breakfast at a restaurant near the Hard Rock Casino.  After breakfast, they went through the Hard Rock, so Pam could see it.  While in the Hard Rock, Bryan had at least two alcoholic drinks.  The four left to go check-in at the IP Casino, so they could change and take Chris to Court.  When they arrived at the IP Casino, Bryan insisted on being let out at the front door, while they parked the car in the garage.

33.    While Joanne was checking in, Chris and Pam went into the Casino to find Bryan. They found Bryan sitting at the blackjack table gambling.

34.    The Casino was serving Bryan two drinks at a time, a Crown and coke along with a shot of Patrone liquor.  At that point, he had two mixed drinks and two shots of Patrone liquor on the table in front of him.  He was already visibly intoxicated.

35.    While they watched, Bryan drank two of the four drinks in front of him.  The Casino waitress retrieved the empty glasses and left.  While the waitress was gone, Bryan slid out of his chair to the floor.

36.     Following Bryan's fall, as the waitress was bringing Bryan another set of drinks, Pam stood between her and Bryan blocking her path. Pam told her, *"Bryan just fell out of the chair. He doesn't need anymore"*. The waitress snapped back, *"I don't know who you are, but he's grown and he asked me to bring him these."* The waitress then walked around Pam and set the drinks on the table in front of him. Chris then told the waitress, *"He's falling out of his chair, don't you think he's had enough?"* The waitress said nothing.

37.     Joanne, Chris and Pam went to their room to change clothes and returned to the Casino to find Bryan at the same table.

38.     An older lady that was playing at the same table told Joanne, *"He needs to stop because he is dropping his chips all over the floor and can not sit up."* Joanne then asked Bryan, *"Bryan, don't you think you need to slow down, it's only 1 o'clock and you are already drunk?"* Joanne tried to convince Bryan to come with them, but he became argumentative with his mother, so they left to avoid trouble.

39.     Bryan had invited his mother, his brother Chris, Pam, and his uncle, Harold McGuire, who lived in Pass Christian, Mississippi, for dinner that night in one of the restaurants at the IP Casino. Harold is a paraplegic and wheelchair dependant.

40.     After Joanne, Chris and Pam attended court and picked up Harold in Pass Christian, they drove back to the IP Casino to meet Bryan for supper. They arrived at the IP Casino around 5:00-5:30 PM. They found Bryan at the same blackjack table.

41.     At this point, Bryan was *heavily and visibly intoxicated.* Bryan was unable to speak without slurring his words. He could not sit up and was falling out of his chair to the floor, dropping

his money and chips.  Bryan was betting large sums of money, far exceeding his means.  He had apparently been lucky and was holding winnings from the Casino.

42.    Joanne, Chris, and Pam tried in vain to convince Bryan to stop drinking and gambling, but he would not.  Joanne told the waitress, *"Don't bring him any more drinks, he's too drunk and can't even sit up"*.  Bryan became agitated when his mother was close, so she had to move away and keep her distance, while Chris and Pam stayed close.

43.    Between 5:30 and 6:30 P.M., the IP Casino continued to serve Bryan free drinks, two at a time.  Almost as soon as Bryan would finish the two drinks, the Casino would have two more at the table for him.  During this hour, Bryan twice fell out of his chair to the floor.  The second time, Bryan knocked the lady sitting next to him out of her chair.  The Casino did nothing.

44.    Pam and Chris pleaded with the dealer and the cocktail waitress to stop serving him alcohol, repeating that he was on medications and not supposed to drink.   The Casino did nothing.

45.    At one point, when Bryan was falling over at the blackjack table, Chris appealed to the pit boss for help.  The IP pit boss's response was, *"He's old enough to make his own decisions."*

46.    Chris approached a security guard at a station nearby and asked him to intervene.  The security guard refused, saying *"if you are a paying customer at the casino, and you ask for whatever, they are going to bring it to you."*  Chris got upset with the guard and the guard threatened to eject Chris from the Casino.

47.    After Bryan fell out of his chair the second time and when Chris moved away, Pam approached the same security guard about what the Casino was doing to her friend.  She asked, *"Is that acceptable, when you have people so drunk they are falling out of chairs?"*  Pam explained to him, *"He's on a lot of medication; he's not suppose to be drinking.  I've done asked them to slow*

down on bringing them to him and I've been trying to get him up from the table". Pam continued, *"He is not supposed to make decisions back at home, and he cannot make them in public",* to which the guard asked, *"What do you mean?"* Pam told him that Bryan had been in an accident and had sustained a brain injury.

48.     The security guard responded, *"Well, he looks normal to me".* Finally, he said words to the effect, *"There's nothing I can do about it. If you are spending money at this casino, they will give you all the alcohol you ask for."*

49.     Bryan was betting wildly, betting up to $1000.00 on a single hand of blackjack. At one point, Bryan had $500.00 bet and stood on a "13", and lost. Bryan complained that he believed he had "21" and had won the hand.

50.     Pam, who is a diabetic and a cancer patient, used her illness to persuade Bryan that she needed to eat because she was not feeling well. Around 6:30 P.M., Bryan attempted to get up and fell to the floor for the third time, dropping his chips everywhere.

51.     Pam picked up what she thought were all of Bryan's chips. Bryan stumbled to the bathroom nearby, as Pam waited outside of the bathroom with what she thought were all of his chips. In the meantime, Pam called Chris, who in turn called Joanne. Chris arrived and went in the bathroom, while Joanne and Pam waited. When Bryan came out of the bathroom, with Chris's assistance, and they began helping Bryan exit the Casino, the female dealer from the blackjack table called to him, *"Bryan, you have some more chips over here. Aren't you going to come play?"* Bryan broke away from his family and friend and headed straight for the table and began playing again.

52.    Pam complained, *"I just spent an hour trying to get him away from the table, so I can get him sobered up some and you are going to call him right back?"* The dealer responded, *"Don't get out of hand with me or I will have you thrown out!"*

53.    Bryan, so visibly and heavily impaired that he could not sit or walk without falling, continued to gamble wildly and the Casino continued to serve him two drinks at a time. Bryan was becoming even more visibly impaired. He could not hold his head up and while he attempted repeatedly to rest his head on his hand supported by his elbow on the table, his head would slip off and fall toward the table. Still, the Casino did nothing but continue to serve Bryan free liquor.

54.    Pam approached the pit boss at a desk area behind the blackjack tables. Pam asked, *"Is it acceptable for someone to be falling down drunk?"* She then said, *"From my opinion of this establishment, this is not the type of place you see a man to be falling down drunk?"* The boss asked, *"Excuse me, what do you mean?"* Pam pointed to Bryan gambling at the blackjack table. She said, *"He fell out of his chair twice and he fell on the floor a third time going to the bathroom. And they are steadily feeding him alcohol. I've asked, his mother's asked, his brother's asked. He's on medications and should not be drinking".* The boss interrupted her, *"Well, who are you, anyway?"* Pam answered, *"I've been a friend of the family a long time?"* The boss again interrupted her, *"You're not his wife?"* *"No Sir",* Pam responded.

55.    The boss then gave Pam essentially the same response that the security guard had given her and Chris, *"If you are in this establishment and you are paying money to play, and you ask for a drink, they will bring it to you. And there's nothing I can do about it."* Pam said, *"He's very hot tempered. What are you going to do if he gets upset with the dealer and assaults her?"* The boss replied, *"Don't worry about that. We'll take care of it if it comes up."*

56.    Pam had to have food, so she could take her night medication. She and Chris went to a restaurant on the same floor, so they could eat and still see Bryan. They sat, talked and ate for about an hour.

57.    Pam looked up from her table and could no longer see Bryan at the blackjack table. She went to investigate and was told Bryan was in the bathroom. She waited outside the door, so long that she became worried and had to find Chris to go in and see if Bryan was alright. Bryan came out of the bathroom hardly able to stand. He stumbled back to the table, where the Casino continued to poison him, two drinks at a time.

58.    Around 9:30-9:40 P.M., Pam, Joanne and Chris went to the room to clean up and change clothes. While they were upstairs, a prostitute spotted her prey and approached Bryan. The prostitute propositioned Bryan in the presence of the other guests, the dealer and other Casino personnel. Openly, while Casino security watch through cameras and dealers and bosses looked on, they made a deal and Bryan paid her for her promised services. The Casino did nothing.

59.    Pam, Joanne and Chris returned to look for Bryan around 10 P.M. It was getting late and they needed to take Harold home. Bryan was still at the table, crippled from the effects of the alcohol served to him for hours combined with his medications and underlying physical and mental condition. Finally, someone from the Casino told Bryan he was cut off from alcohol. They would let him continue to throw his money away, but they stated they would not serve him anymore free alcohol.

60.    Bryan got angry and began walking away from the table. The prostitute moved with him with her hand in his pocket. Realizing this, Joanne and Chris tried to intervene. Joanne got in an argument with the prostitute and then went to get security. A security officer came, intervened and got Bryan's money back from the prostitute.

61.     Bryan, cut off from alcohol by the Casino, went to the Casino's Chill Lounge, where the bartender began serving him Long Island Ice Tea, a combination of five liquors made to taste as innocuous as ice tea.  Pam and his family briefly lost track of him, but as they were leaving the Casino to take Harold home, they spotted him in the Chill lounge.  There were 50-80 people in the lounge.

62.     Earlier, Joanne had called a family friend, Jeanne Goldstein, who had known Bryan from childhood, and told her about Bryan's condition and that the Casino would not stop serving him alcohol.  Joanne asked for her help.  Jeanne got dressed and drove to the IP Casino to assist.  When Bryan was in the Chill Lounge, Jeanne went in to talk to him.  Bryan insulted her and told her to get out.

63.     Chris went in next, but got only ten feet or so in the door, when Bryan started cussing him.  Chris, realizing his presence made the situation worse, turned around and walked out.

64.     Joanne went in to convince Bryan to leave.  Bryan was standing up, flexing his muscles and shouting, ***"No one is going to mess with me, because, I'm crazy!"*** Joanne retreated.  She and Chris then asked Pam to go in and talk to him.

65.     Pam was stopped at the door by the doorman because she did not have her I. D.  She explained everything to the doorman, including that Bryan was on medications, had been drinking for hours and had been cut off upstairs.  She asked, ***"Why would ya'll cut him off upstairs and then let him come down here and drink?"*** He responded, ***"It's a totally different part, we did not know anything about it."*** Still, the doorman did nothing to stop the lounge from serving Bryan.  He did, however, let Pam in to see if she could stop him.

66.     Pam approached Bryan and asked him to come with them to take Harold home and to get something to eat. Then, she promised, she would come back with him. Bryan refused and ordered another Long Island Ice Tea. Pam motioned the bartender down to the end of the bar away from Bryan, where she told him, *"He's been cut off upstairs, please don't give him anymore."* The bartender responded, *"He's already had three drinks and he's only been in here 15 minutes. I can see how intoxicated he is and I'm not going to serve him much more."*

67.     Around 10:30-10:45 P.M., Joanne and Chris took Harold back to his home. They stopped on the way and got him a sandwich at Arby's. Because of his paraplegia condition, they had to help Harold into bed before returning. The round trip took approximately two hours. When they returned to the Casino, Bryan was not in the lounge.

68.     Pam asked the doorman where Bryan was. He told Pam the security guards had escorted him to his room. Pam asked, *"Do you know for a fact, that they took him to his room?"* The doorman responded, *"No, all I know is that he was escorted out of here. He was just way too intoxicated, he fell out of his chair twice and we can't have that here."*

69.     Chris, Pam and Joanne went to the room looking for him. They could see that he had been on the bed, but he was not in the room. They were going to return to the Casino floor to look for him. Joanne opened the door and saw her son on the floor and half in the bathtub, facing the toilet, with his pants around his ankles. Thinking he was passed out, she called for Chris and Pam.

70.     Pam, who is a trained EMR, looked in and saw that the palm of one of his hands, which was facing up behind his back, was bluish. Pam realized that he was deprived of oxygen. She immediately began performing CPR, while Joanne and Chris screamed for help. For twenty minutes Pam performed CPR in the cramped bathroom, her strength nearly exhausted, before a house medic from the IP Casino arrived. When she did, she told Pam to keep going, since she did not have a

mouthpiece.  Pam struggled to keep the breaths and compressions going.  Another twenty minutes went by before the AMR medics arrived.  They told Pam to keep going, while they unpacked gear.

71.     Finally, after forty exhausting minutes of trying to save her friend's life, following hours of trying to stop the IP Casino from killing him, Pam was relieved of duty.  Her friend since the age of 10 lay dead at her feet.

72.     Further efforts to save him were futile.  He was taken to the hospital and pronounced dead at 3:19 A.M.

73.     The autopsy revealed that he died from alcohol poisoning combined with his medications.

74.     Even though Joanne, Chris and Pam tried with all their will to prevent the Casino from poisoning Bryan, they were helpless to prevent his injury and death.  Every level of responsible employee they could access, they confronted, only to be ignored and threatened with ejection.

75.     For a person with Bryan's disabilities, gambling had the same effect on the brain as drugs, particularly cocaine.  These effects combined with his disabilities, his prescribed medications and the unlimited free drinks meant his almost certain death.   The Casino was warned by his family of his condition and medications.  Bryan's serious injury and death were clearly foreseeable to a reasonable and prudent operator of a casino and a permittee of a liquor license.

76.     Warned that Bryan suffered from severe mental disability, including traumatic brain injury, that he was on medications that did not mix with alcohol, that he could not drink alcohol and could not say "no" to the free liquor, the Casino continued to serve free alcohol to Bryan.  Long after Bryan was falling-down drunk, unable to hold his head up, walk or talk and long past being just

"visibly intoxicated", the Casino continued to push its "drugs" on Bryan, alcohol and gambling, and continued to serve him drinks in its Chill Lounge.

77.    Despite their best efforts to save him from harm, Bryan was slowly poisoned, while his friend and family, including Chris and Joanne, helplessly watched.  After the Casino hauled Bryan, minutes from death, to his room and left him without providing any aid, Bryan collapsed on the bathroom floor, dying. When he was found, Chris and Joanne watched in painful horror as Bryan's friend, Pam, tried to save their loved one, without any help from the Casino "medic", who did not have her "mouthpiece".

78.    On these facts and others asserted below, plaintiffs make the following claims for relief:

### E.    CLAIMS FOR RELIEF

### COUNT ONE
### NEGLIGENCE CAUSING INJURY AND WRONGFUL DEATH

79.    The plaintiffs adopt and incorporate by reference the allegations contained in Paragraphs 1 through 78.

80.    Imperial Palace of Mississippi, LLC (IMP-MS) was an Operating Licensee of the IP Casino and operated the gambling establishment known as the Imperial Palace Casino located at 850 Bayview Avenue, Biloxi, Mississippi 39530.

81.    Bryan, Joanne and Chris were business invitees of IPM-MS.  As business invitees, IPM-MS owed them a duty of reasonable care.

82.    IP-MS breached the duty of reasonable care owed to Bryan, Joanne and Chris, which breach was negligence.

83.    Pursuant to the Mississippi Gaming Control Act, MISS CODE ANN. § 75-76-1, *et seq*, (1990, as supplemented and revised), IPM-MS was subject to the authority and control of the Mississippi Gaming Commission and regulations adopted by the Commission [MGC Regulations].

84.    Pursuant to MGC Reg. II.A. Section 1 (a) "It is the declared policy of the State of Mississippi that all establishments where gambling games are conducted or operated must be licensed and controlled so as to better *protect the public health, safety, morals, good order and welfare* of its inhabitants." The Commission mandated that all casinos in Mississippi be operated in a manner suitable to protect the public health, safety, morals, good order and general welfare of the inhabitants of the State of Mississippi. MGC Reg. III.A. Section 1(a)

85.    IPM-MS had a duty to operate its establishment in such a manner as to protect the public health, safety, morals, good order and general welfare of its invitees. IPM-MS breached this duty of care owed to Bryan, Chris and Joanne.

86.    Pursuant to MGC Reg. III.A. Section 2(b) and (c) it was unlawful for IPM-MS to permit persons who were *visibly intoxicated* to participate in gaming activity or to serve complimentary intoxicating beverages in the casino area to persons who were *visibly intoxicated*.

87.    Bryan, Chris, and Joanne were members of the class of persons these laws were designed to protect.

88.    By engaging in the conduct described, IPM-MS violated the laws of the State of Mississippi as promulgated by the Mississippi Gaming Commission, which were enacted to protect persons such as Bryan, Chris, and Joanne.  Such violations constitute negligence *per se*.

89.    At all time pertinent hereto, IPM-MS was the holder of a permit issued by the Mississippi Tax Commission-Alcohol Beverage Control, to sell or furnish liquor at the IP Casino.

90.     Pursuant to MISS CODE ANN §67-1-83, it is "unlawful for any permittee or other person to sell or furnish any alcoholic beverage to any person who is visibly intoxicated, or to any person who is known to habitually drink alcoholic beverages to excess, or to any person who is known to be an habitual user of narcotics or other habit-forming drugs."

91.     Bryan, Chris, and Joanne were members of the class of persons this law was designed to protect.

92.     By engaging in the conduct described, IPM-MS violated the provisions of MISS CODE ANN. §67-1-83, which were enacted to protect persons such as Bryan, Chris, and Joanne.  These violations constituted negligence *per se*.

93.     The negligent conduct of IPM-MS was the proximate cause of the injury and wrongful death of Bryan.

## COMPENSATORY DAMAGES

94.     Pursuant to MISS CODE ANN §11-7-13 (Supp. 2004), the plaintiffs are beneficiaries entitled to bring this action to recover for the injuries and death of Bryan.  The plaintiffs, Joanne Glenn (mother), Daniel Glenn (father) and the Estate of Christopher Thomas Glenn (brother) are entitled to recover the following compensatory damages:

    a.   physical and mental pain and suffering experienced by Bryan prior to his death;

    b.   the Present Net Cash Value of the continued existence of Bryan;

    c.   the loss of society and companionship to each survivor occasioned by Bryan's death; and

    d.   such other damages as are allowed by law.

95.     The Estate of Bryan Lee Glenn is entitled to recover for the medical, funeral, including autopsy, preparation, transportation, burial of his body and other related expenses.

**PUNITIVE DAMAGES**

96.    IPM-MS acted with gross negligence, which evidenced a willful, wanton or reckless disregard for the safety of others, including Bryan Lee Glenn.

97.    Punitive and exemplary damages should be assessed against the defendants in an amount necessary to punish them and to deter others from committing such gross, willful, wanton and reckless conduct in the future.

## COUNT TWO
## NEGLIGENT FAILURE TO RENDER AID CAUSING INJURY AND WRONGFUL DEATH

98.    The plaintiffs adopt and incorporate by reference the allegations contained in Paragraphs 1 through 97.

99.    IPM-MS had a duty to take reasonable measures to render medical aid to Bryan.

100.    IPM-MS breached this duty and such breach was gross negligence, which proximately caused or contributed to the injury and death of Bryan.

101.    Pursuant to MISS CODE ANN §11-7-13 (Supp. 2004), the plaintiffs are beneficiaries entitled to bring this action to recover for the injuries and death of Bryan.  The plaintiffs, Joanne Glenn (mother), Daniel Glenn (father) and the Estate of Christopher Glenn (brother) are entitled to recover the following compensatory damages:

   a.   physical and mental pain and suffering experienced by Bryan prior to his death;
   b.   the Present Net Cash Value of the continued existence of Bryan;
   c.   the loss of society and companionship to each survivor occasion by Bryan's death; and
   d.   such other damages as are allowed by law.

102.    The Estate of Bryan Lee Glenn is entitled to recover for the medical, funeral, including autopsy, preparation, transportation, burial of his body and other related expenses.

**PUNITIVE DAMAGES**

103.    IPM-MS acted with gross negligence, which evidenced a willful, wanton or reckless disregard for the safety of others, including Bryan Lee Glenn.

104.    Punitive and exemplary damages should be assessed against the defendants in an amount necessary to punish them and to deter others from committing such gross, willful, wanton and reckless conduct in the future.

**COUNT THREE**
**NEGLIGENT INFLICTION OF MENTAL DISTRESS**
**ESTATE OF CHRISTOPHER THOMAS GLENN**

105.    The Estate of Christopher Thomas Glenn adopts and incorporates by reference the allegations contained in Paragraphs 1 through 104.

106.    Christopher Thomas Glenn was the only sibling of Bryan Lee Glenn and their relationship was one founded in deep and abiding love, affection and emotional dependency.

107.    Beginning at around 12:30 P.M. on August 6, 2009, Chris witnessed the slow, but certain execution of his brother by poisoning at the hands of IPM-MS.

108.    When Bryan was found on the floor of the bathroom, Chris watched in painful horror as his friend, Pam tried to save his brother.

109.    As a direct and proximate result of having witnessed the negligent, willful, wanton or reckless actions of the Casino toward his brother and his brother's slow, but certain poisoning death, Chris suffered extreme emotional and mental injury, causing physical injury, for which he was hospitalized and never fully recovered.

110.    The Estate of Christopher Thomas Glenn is entitled to compensatory damages from the defendants for the extreme emotional, mental and physical injuries, proximately caused by the wrongful conduct of IPM-MS, including damages for:

   a.   mental and physical pain and sufferings:

   b.   medical expenses; and

   c.   such other damages as allowed by law.

## PUNITIVE DAMAGES

111.    IPM-MS acted with gross negligence, which evidenced a willful, wanton or reckless disregard for the safety of others, including Bryan Lee Glenn.

112.    Punitive and exemplary damages should be assessed against the defendants in an amount necessary to punish them and to deter others from committing such gross, willful, wanton and reckless conduct in the future.

## COUNT FOUR
## NEGLIGENT INFLICTION OF MENTAL DISTRESS
## JOANNE GLENN

113.    Joanne adopts and incorporates by reference the allegations contained in Paragraphs 1 through 112.

114.    Christopher Thomas Glenn and Bryan Lee Glenn were Joanne's only children.  Her relationship to them was founded in deep and abiding love, affection and devotion.

115.    Beginning at around 5:30 P.M. on August 6, 2009, Joanne witnessed the slow, but certain execution of her son, Bryan, by poisoning at the hands of IPM-MS.

116.    As a direct and proximate result of having witnessed the negligent, willful, wanton or reckless actions of the Casino toward Bryan and her son's slow, but certain poisoning death, Joanne suffered severe emotional and mental injury.

117.    Joanne also witnessed the injury to her son Chris caused by the willful, wanton or reckless conduct of the Casino and endured the months of continuing emotional and physical decline of Chris caused by the wrongful conduct of IPM-MS.

118.    Joanne is entitled to compensatory damages from the defendants for these emotional, mental and physical injuries, proximately caused by the wrongful conduct of IPM-MS, including damages for:

     a.    mental and physical pain and sufferings:

     b.    medical expenses, if any; and

     c.    such other damages as allowed by law.

## PUNITIVE DAMAGES

119.    IPM-MS acted with gross negligence, which evidenced a willful, wanton or reckless disregard for the safety of others, including Bryan Lee Glenn.

120.    Punitive and exemplary damages should be assessed against the defendants in an amount necessary to punish them and to deter others from committing such gross, willful, wanton and reckless conduct in the future.

## COUNT FIVE
## BREACH OF FIDUCIARY DUTIES

121.    The plaintiffs adopt and incorporate by reference the allegations contained in Paragraphs 1 through 120.

122.    The managers, members, and trustees of the dissolved companies owed a fiduciary duty to the creditors of IPM-MS, IPM-NV and IP Holdings.

123.    The managers, members, and trustees of the dissolved companies breached that fiduciary duty, which proximately caused damages to the plaintiffs by removing or reducing assets of the responsible parties to deny a remedy to the plaintiffs.

124.    The managers, members, and trustees of the dissolved companies should be held liable for the compensatory damages suffered by the plaintiffs to the extent that they are not fully compensated because of said breach of duty.

### COUNT SIX
### ACCOUNTING, DISGORGEMENT AND IMPOSITION OF A CONSTRUCTIVE TRUST

125.    The plaintiffs adopt and incorporate by reference the allegations contained in Paragraphs 1 through 124.

126.    The plaintiffs are entitled to an accounting, disgorgement and imposition of a constructive trust on any assets of IPM-MS, IPM-NV and/or IP Holdings received by the defendants or the Engelstad Family Foundation as a result of any actual or attempted dissolution of these entities or Doe defendants.

WHEREFORE PREMISES CONSIDERED, the plaintiffs request this Complaint be received and filed, the defendants be summoned to appear and that this Court grants the following relief:

A.  Award compensatory damages proximately caused by the tortious and wrongful conduct of the defendants in the sum of Twenty-Five Million and 00/100 Dollars ($25,000,000.00), or as may be shown by the proof;

B.  Award punitive or exemplary damages of Fifty Million and 00/100 Dollars ($50,000,000.00) or in such amount necessary to punish the defendants and to deter them and others from engaging in such conduct in the future;

C.  Award attorneys fees, pre-judgment and post judgment interest and costs of litigation;

D.  Order an accounting, disgorgement and impose a constructive trust on any assets of IPM-MS, IPM-NV and/or IP Holdings received by the defendants as a result of any attempted or actual dissolution of these entities or Doe defendants or any breach of their fiduciary duties owed to the plaintiffs; and

E.  Such other relief, either general or specific, to which they may be entitled in the premises.

Respectfully submitted on the 25th day of July 2012.

JOANNE GLENN, INDIVIDUALLY AND AS
ADMINISTRATRIX OF THE ESTATE OF
CHRISTOPHER THOMAS GLENN AND
ADMINISTRATRIX OF THE ESTATE OF BRYAN
LEE GLENN, AND DANIEL LEE GLENN,
PLAINTIFFS

_____
By: Michael Holleman (MSBAR No. 2524)


Attorneys for the Plaintiffs:

Michael B. Holleman
Holleman Law Firm, PLLC
MSBAR No. 2524
P. O. Box 1598
2004 24th Avenue
Gulfport, Mississippi 39502
hollemanlawfirm@bellsouth.net
(228) 868-0064-Office
(228) 868-09250 Facsimile
mhollemanlawfirm@bellsouth.net